**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

JOSHUA JAMES CASTILLO,

      Plaintiff,

    vs.                            Civ. No. 19-722 KK

ANDREW SAUL, Commissioner,
Social Security Administration,

      Defendant.

**MEMORANDUM OPINION AND ORDER[1]**

    Joshua James Castillo ("Mr. Castillo") appeals the final decision of the Commissioner of the Social Security Administration denying his applications for Child Insurance Benefits ("CIB") and Supplemental Security Income ("SSI") benefits.[2] (Docs. 1, 24.) In agency proceedings below, the Administrative Law Judge ("ALJ") determined that, despite his severe impairments, Mr. Castillo is not disabled because he can perform jobs that exist in significant numbers in the national economy. Mr. Castillo claims the ALJ erred in her decision. The Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c). Having meticulously reviewed the entire record and the relevant law, and being otherwise fully advised, the Court remands this case for further consideration by the agency.

---

[1] Pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have consented to the undersigned to conduct dispositive proceedings and order the entry of final judgment in this case. (Doc. 15.)

[2] Mr. Castillo incorrectly states that he appeals the Commissioner's denial of his application for Disability Insurance Benefits. (Doc. 1 at 1-3.) In fact, Mr. Castillo applied for CIB under Title II of the Social Security Act based on his father's earnings record. (AR 1182-1183.) Pursuant to such an application, the child of "an insured person" is entitled to benefits when he or she is "18 years old or older and [has] a disability that began before ….[turning] 22 years old." 20 C.F.R. § 404.350(a).

# I.  Standard of Review

Judicial review of the Commissioner's denial of disability benefits is limited to whether the final decision is supported by substantial evidence and whether the Commissioner applied the correct legal standards to evaluate the evidence. 42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004). In undertaking its review, the Court must meticulously examine the entire record but may neither reweigh the evidence nor substitute its judgment for that of the Commissioner. *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007). In other words, the Court does not reexamine the issues de novo. *Sisco v. U.S. Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993). The Court will not disturb the Commissioner's final decision if it correctly applies legal standards and is based on substantial evidence in the record.

A decision is based on substantial evidence where it is supported by "relevant evidence . . . a reasonable mind might accept as adequate to support a conclusion." *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2006). A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]" *id.*, or "constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). The Commissioner's decision must "provide this Court with a sufficient basis to determine that appropriate legal principles have been followed." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005). Therefore, although an ALJ is not required to discuss every piece of evidence, "the record must demonstrate that the ALJ considered all of the evidence," and "the [ALJ's] reasons for finding a claimant not disabled" must be "articulated with sufficient particularity." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996).

# II.  Procedural History

Mr. Castillo filed his CIB and SSI applications on June 29, 2012, alleging a disability onset date of April 6, 2008. (AR[3] 89-90, 264, 1031, 1182.) In his initial Disability Report, Mr. Castillo alleged he was limited in his ability to work due to IgA nephropathy, loin pain hematuria syndrome, and depression. (AR 296.) In a subsequent report, Mr. Castillo indicated that he also suffered from migraine headaches, fatigue, and back, joint, and stomach pain. (AR 358.)  Mr. Castillo's applications were initially denied on January 30, 2013, (AR 91-103, 104-116), and again upon reconsideration on May 9, 2013. (AR 119-133, 134-148.) Mr. Castillo requested a hearing before an ALJ, (AR 163-164), and on July 11, 2014, he appeared before ALJ Michelle Lindsay with non-attorney representative John Bishop.[4] (AR 19, 54, 157, 159.)  Impartial vocational expert ("VE") Pamela Bowman also appeared.  (AR 54, 175.)  On November 24, 2014, ALJ Lindsay issued an unfavorable decision finding that Mr. Castillo had not been disabled since his alleged onset date. (AR 19-31.)  Mr. Castillo sought review by the Appeals Council, which was denied. (AR 1-4.) Mr. Castillo then filed a complaint in the United States District Court for the District of New Mexico challenging the Commissioner's decision. (AR 1050-1051.) On March 8, 2017, the Honorable William P. Lynch ruled the Appeals Council erred in failing to consider qualifying new evidence that contradicted the ALJ's decision and remanded to the agency for further proceedings. (AR 1059-1069.)

On June 27, 2018, Mr. Castillo attended a second hearing before ALJ Lindsay with attorney Gary Martone.  (AR 1004.)  Impartial VE Diane Weber also appeared.  (AR 1004, 1237-1239.) On August 3, 2018, ALJ Lindsay again issued an unfavorable decision finding Mr. Castillo not disabled. (AR 981-996.) First, the ALJ found that Mr. Castillo could seek CIB on the earnings

---

[3] Citations to "AR" are to the Administrative Record lodged with the Court on March 26, 2020.  (Doc. 19.)

[4] The hearing transcript incorrectly identifies Mr. Bishop as Mr. Castillo's attorney.  (AR 54.)  In fact, Mr. Bishop is a "non-attorney [representative] eligible for direct payment under SSA law."  (AR 157, 159.)

record of an insured person because he had not yet attained age 22 as of April 6, 2008, his alleged onset date. (AR 984.) Then, applying the familiar five-step sequential evaluation process ("SEP"),[5] the ALJ determined at step one that Mr. Castillo had not engaged in substantial gainful activity since his alleged onset date. (AR 984.) At step two, the ALJ found Mr. Castillo has the severe impairments of:  (1) IgA nephropathy with hematuria and loin pain; (2) hypertension; and, (3) depressive disorder. (AR 984-985.) The ALJ also found Mr. Castillo has the non-severe impairments of degenerative disc disease of the lumbar spine, migraine headaches, mood disorder, post-traumatic stress disorder, panic disorder, and substance abuse. (AR 984-985.)  At step three, the ALJ determined the severity of Mr. Castillo's impairments, considered singly or in combination, did not meet or medically equal any of the listings in 20 C.F.R. part 404, Subpart P, Appendix One. (AR 985-987.) Next, in assessing Mr. Castillo's residual functional capacity ("RFC"), the ALJ found Mr. Castillo could perform "a limited range of work contained in the light exertional level," as defined in 20 C.F.R. §§ 404.1567 and 416.967 and SSR 83-10,[6] and was further restricted to "occasionally climb[ing] stairs and ramps, stoop[ing], crouch[ing], kneel[ing], and crawl[ing], but he can never climb ladders, ropes or scaffolds. He must avoid frequent exposure to extreme cold. He cannot perform assembly-line paced work." (AR 987.)

At step four, the ALJ found Mr. Castillo had no past relevant work. (AR 994). At step five, the ALJ determined he had at least a high school education and could communicate in English. (AR 994-995.) Relying on the VE's testimony, the ALJ found that, considering Mr. Castillo's age, education, work experience, and assessed RFC, he could work as a charge account clerk, document

---

[5] *See Bowen v. Yuckert*, 482 U.S. 137, 140-141 (1987); 20 C.F.R. § 404.1520.

[6] Specifically, the ALJ found Mr. Castillo can "lift, carry, push, and pull up to 20 pounds occasionally and ten pounds frequently, sit for at least six hours in an eight-hour workday, and stand and walk for two hours in an eight-hour workday."  (AR 987.)

preparer, or toy stuffer. (AR 995.) Upon finding Mr. Castillo was able to perform other work existing in significant numbers in the national economy, the ALJ concluded Mr. Castillo was "not disabled," as defined by 20 C.F.R. §§ 404.1520(g) and 416.920(g), from April 6, 2008 through the date of the decision. (AR 995-996).

On August 27, 2018, Mr. Castillo again sought review by the Appeals Council, arguing the ALJ failed to:  (1) comply with Judge Lynch's remand order; (2) adequately consider the effects of his mental health impairments; (3) properly consider his Global Assessment Functioning scores; and, (4) find a significant number of jobs at step five.  (AR 1166-1171.) The Appeals Council again denied Mr. Castillo's request for review, (AR 971-974), and Mr. Castillo's current petition to this Court followed. (Doc. 1.)

### III.  Relevant Medical History

Mr. Castillo suffers from IgA nephropathy, a chronic kidney disease that affects kidney function.[7] In 2008, at the age of fourteen, after an extended period of gross hematuria[8] and proteinuria,[9] Mr. Castillo established care with pediatric nephrologist Robert Miller, M.D. (AR 505-507.) Results from a kidney biopsy confirmed a diagnosis of "moderate to moderately severe"

---

[7] IgA nephropathy "occurs when an antibody called immunoglobulin A (IgA) builds up in [the] kidneys. This results in local inflammation that, over time, can hamper [the] kidneys' ability to filter waste from [the] blood. …[It] usually progresses slowly over years, but the course of the disease varies from person to person. Some people leak blood in their urine without developing problems, some eventually achieve complete remission and others develop end-stage kidney failure." Mayo Clinic, *Disease & Conditions, IgA nephropathy*, https://www.mayoclinic.org/diseases-conditions/iga-nephropathy/symptoms-causes/syc-20352268 (last accessed December 9, 2020).

[8] Gross hematuria is blood that is visible in urine without the use of a microscope. Mayo Clinic, *Diseases & Conditions: Blood in urine (hematuria)*, https://www.mayoclinic.org/diseases-conditions/blood-in-urine/symptoms-causes/syc-20353432 (last accessed December 9, 2020).

[9] "Proteinuria is increased levels of protein in the urine. This condition can be a sign of kidney damage." Cleveland Clinic, *Disease & Conditions, Proteinuria*, https://my.clevelandclinic.org/health/diseases/16428-proteinuria (last accessed December 9, 2020).

IgA nephropathy. (AR 505.) Mr. Castillo was initially treated with Prednisone,[10] Imuran,[11] and Enalapril.[12] (AR 409-412, 505-507.) Dr. Miller subsequently replaced Imuran with CellCept,[13] and Mr. Castillo continued to take Prednisone, CellCept, and Enalapril through at least August 2015, the date of his most recent clinical visit in the record. (*Id.*; *see, e.g.*, AR 568-569 (February 2011); AR 581-583 (July 2011); AR 526-528 (November 2011); AR 513-515 (July 2012); AR 604-606 (February 2013); AR 719-721 (May 2013); AR 882-883 (September 2014); AR 125-1253 (August 2015).)

In the initial stages of treatment, Mr. Castillo showed improvement in his gross hematuria and proteinuria; however, he later developed significant abdominal and flank pain. (AR 505.) A subsequent kidney biopsy in October 2011 demonstrated focal proliferative glomerulonephritis,[14] with minimal crescents, despite his having been on an extended course of immunosuppressive medications. (AR 505.) In a January 2012 letter, Dr. Miller noted that Mr. Castillo experienced persistent pain typically associated with gross hematuria, and dull, aching pain even when gross

---

[10] "Prednisone is in a class of medications called corticosteroids. It works…by reducing swelling and redness and by changing the way the immune system works." U.S. National Library of Medicine, Medline Plus, *Prednisone,* https://medlineplus.gov/druginfo/meds/a601102.html (last accessed December 9, 2020).

[11] Imuran, also known as azathioprine, "is in a class of medications called immunosuppressants. It works by decreasing the activity of the body's immune system." U.S. National Library of Congress, Medline Plus, *Azathioprine*, https://medlineplus.gov/druginfo/meds/a682167.html (last accessed December 9, 2020).

[12] "Enalapril is used alone or in combination with other medications to treat high blood pressure." U.S. National Library of Congress, Medline Plus, *Enalapril*, https://medlineplus.gov/druginfo/meds/a686022.html (last accessed December 9, 2020).

[13] CellCept, also known as mycophenolate, is "used with other medications to help prevent transplant organ rejection.… It works by weakening the body's immune system so it will not attack and reject the transplanted organ." U.S. National Library of Congress, Medline Plus, *Mycophenolate*, https://medlineplus.gov/druginfo/meds/a601081.html (last accessed December 9, 2020).

[14] Glomerulonephritis "is inflammation of the tiny filters in [the] kidneys (glomeruli).… Glomerulonephritis occurs on its own or as part of another disease.… Severe or prolonged inflammation associated with glomerulonephritis can damage [the] kidneys." Mayo Clinic, *Diseases & Conditions: Glomerulonephritis*, https://www.mayoclinic.org/diseases-conditions/glomerulonephritis/symptoms-causes/syc-20355705 (last accessed December 9, 2020).

hematuria was not present. (AR 505-506.) After extensive evaluation, Dr. Miller diagnosed Mr. Castillo with loin pain hematuria syndrome.[15] (AR 505-506.) In his January 2012 letter, Dr. Miller observed that loin pain hematuria syndrome has been associated with IgA nephropathy and is "very difficult to control." (AR 506.)

Mr. Castillo was referred to pain management clinics. (AR 506.) However, after a medication prescribed by a pain management provider caused significant side effects leading to his hospitalization in a mental health unit, Mr. Castillo elected not to seek treatment from that provider again.  (AR 506.)  Mr. Castillo preferred to use marijuana rather than narcotics to treat his pain. (*See, e.g.,* AR 535 (July 2010); AR 565-566 (December 2010); AR 568-569 (February 2011); AR 532-534 (March 2011); AR 505-506, 523-524 (January 2012); AR 604-606 (February 2013); AR 653 (May 2013).)

In his treatment notes, Dr. Miller regularly documented that Mr. Castillo was "doing relatively well."  (*See, e.g.,* AR 535 (July 2010); AR 523 (January 2012); AR 520 (April 2012); AR 513 (July 2012); AR 509 (October 2012); AR 719-721 (May 2013).)  However, Dr. Miller also consistently noted that Mr. Castillo continued to have intermittent abdominal, kidney, and/or flank pain, sometimes preceded or followed by gross hematuria, and that this chronic pain was "his major issue." (*See, e.g.,* AR 526-527 (November 2011); AR 523-524 (January 2012); AR 520-521, 594 (April 2012); AR 513-514, 597 (July 2012); AR 509 (October 2012); AR 604 (February 2013); AR 719 (May 2013).) Dr. Miller also noted that Mr. Castillo complained of intermittent headaches and/or back pain.[16] (*See, e.g.,* AR 529 (May 2011); AR 581 (July 2011); AR 513 (July

---

[15] Loin pain hematuria syndrome "causes severe, unexplained loin pain and blood in the urine (hematuria). The pain can be on one side of [the] body or both sides. The frequency and length of pain episodes can vary." U.S. Department of Health and Human Services, National Institutes of Health, *Loin pain hematuria syndrome*, https://rarediseases.info.nih.gov/diseases/6920/loin-pain-hematuria-syndrome (last accessed December 9, 2020).

[16] Dr. Miller noted that Mr. Castillo's back pain was "similar to the pain that he had with loin pain hematuria syndrome" but stated that its etiology remained unclear.  (AR 510.)

2012); AR 719-721 (May 2013).) In an October 2012 treatment note, Dr. Miller wrote that Mr. Castillo "may not be able to work consistently because of the recurrent nature of his pain and hematuria."[17] (AR 509.)  Mr. Castillo continued to see Dr. Miller for treatment through May 2013, at which time Mr. Castillo reported that marijuana and "intermittent" hydrocodone were providing him with "variable" pain control. (AR 719-720.)

In October 2013, Mr. Castillo established care with an adult nephrologist, Jayant Kumar, M.D. (AR 676-678.) Mr. Castillo recounted a recent episode of gross hematuria and described chronic, daily pain. (AR 676.)  Dr. Kumar noted that lab work showed trace blood in Mr. Castillo's urine, increased his dose of Enalapril, and recommended yoga and acupuncture "for non-pharma pain control." (AR 677.) Dr. Kumar added that if Mr. Castillo's pain "remained a big hind[rance] with quality of life… nephr[e]ctomies[18] and auto-transplant may be an option." (AR 677.) At follow-up appointments in January and October 2014, Mr. Castillo denied having gross hematuria and reported decreased abdominal pain but recounted a recent trip to the emergency room for back pain. (AR 679, 892-893.) In his physical examinations, Dr. Kumar documented some flank tenderness and, in January 2014, elevated blood pressure. (AR 679-680, 893.) Dr. Kumar noted that Mr. Castillo's pain had improved but, given his ongoing symptoms, increased his doses of Enalapril and CellCept. (AR 680, 892-893.) As further discussed below, in June 2014, Dr. Kumar signed a medical source statement indicating that Mr. Castillo was limited to less than sedentary work. (AR 714-717, 802-805.)

---

[17] More specifically, Dr. Miller wrote that Mr. Castillo was "attempting to find 'or' [sic] at this time. History [sic] concerned, however, that he may not be able to work consistently because of the recurrent nature of this pain and hematuria." (AR 509.) The errors in this notation make it unclear whether Dr. Miller was documenting Mr. Castillo's report or his own opinion. Regardless, the ALJ did not address the notation in her decision. (AR 984-994.)

[18] "Nephrectomy…is a surgical procedure to remove all or part of a kidney." Mayo Clinic, *Tests & Procedures, Nephrectomy (kidney removal),* https://www.mayoclinic.org/tests-procedures/nephrectomy/about/pac-20385165 (last accessed December 9, 2020).

In addition to treating with Drs. Miller and Kumar, Mr. Castillo saw other providers, including pediatrician Juliane Kim, M.D., internist Lisa Strickland, M.D., and general practitioners Janelle Montoya, M.D., and Jeffrey Thomas, M.D., for his ailments. At these visits, *inter alia*, he complained of frequent migraine headaches. (*See, e.g.*, AR 751-757 (February 2014); AR 747 (March 2014); AR 1265-1267 (January 2015); AR 1262-1264 (April 2015); AR 1259-1261 (May 2015).) In January 2015, Mr. Castillo reported his IgA nephropathy was stable, (AR 1265-1267), but in August 2015 he reported blood in his urine "on the days [his pain] really bothers him." (AR 1251.) Additionally, Mr. Castillo persistently complained of lower back, abdominal, and flank pain with occasional use of hydrocodone. (*See, e.g.,* AR 661-662 (July 2011); AR 651-653 (May 2013); AR 760 (November 2013); AR 882-883 (September 2014); AR 1262-1263 (April 2015); AR 1255-1258 (July 2015); AR 1251-1253 (August 2015).) Mr. Castillo also sought treatment at emergency rooms for abdominal, lower back, and/or flank pain. (*See, e.g.*, AR 444-447 (March 2012); AR 944-945 (July 2013); AR 883 (September 2014).)

Following his IgA nephropathy diagnosis, Mr. Castillo reported problems with depression, anger, and anxiety. (*See, e.g.,* AR 409-411 (December 2009); AR 535 (July 2010); AR 565 (December 2010); AR 585-586 (October 2011); AR 505-506 (January 2012).) Mr. Castillo sought psychiatric treatment for his mental health issues, was prescribed medications including venlafaxine,[19] trazodone,[20] and fluoxetine[21] for major depressive disorder (*see, e.g.,* AR 529 (May

---

[19] Venlafaxine, also known as Effexor, "is used to treat depression…[,] generalized anxiety disorder…[,] social anxiety disorder…[,] and panic disorder." U.S. National Library of Congress, Medline Plus, *Venlafaxine*, https://medlineplus.gov/druginfo/meds/a694020.html (last accessed December 9, 2020).

[20] "Trazodone is used to treat depression." U.S. National Library of Congress, Medline Plus, *Trazodone*, https://medlineplus.gov/druginfo/meds/a681038.html (last accessed December 9, 2020).

[21] Fluoxetine, also known as Prozac, "is used to treat depression, obsessive-compulsive disorder…, some eating disorders, and panic attacks." U.S. National Library of Congress, Medline Plus, *Fluoxetine*, https://medlineplus.gov/druginfo/meds/a689006.html (last accessed December 9, 2020).

2011); AR 686-713 (June 2013-April 2014); AR 815-839 (November 2014-March 2015)), and briefly attended therapy. (AR 696-697 (September 2013); AR 833-838 (November 2014).) Notwithstanding this mental health treatment, Mr. Castillo continued to report significant psychiatric symptoms through at least May 2015.  (AR 815-838.)

## IV.  <u>Analysis</u>

In support of his motion to remand ("Motion"), Mr. Castillo argues that:  (1) the ALJ failed to properly consider Dr. Kumar's opinions; (2) the ALJ incorrectly applied the adult disability standard despite Mr. Castillo's allegation that he became disabled at age fourteen; (3) the record contradicts the ALJ's finding that Mr. Castillo's migraine headaches are non-severe; and, (4) the ALJ failed to incorporate social restrictions in Mr. Castillo's RFC despite finding mild limitations in his social functioning at step three. (Doc. 24 at 20-25.) For the reasons discussed below, the Court finds the ALJ erred in her analysis of Dr. Kumar's opinions and grants Mr. Castillo's request to remand on this basis.

## A.  The ALJ's Consideration of Dr. Kumar's Opinions

### i.  Dr. Kumar's Opinions

On June 2, 2014, Dr. Kumar signed a form medical source statement outlining Mr. Castillo's work-related physical limitations. (AR 714-717, 802-805.) In the "exertional limitations" category, Dr. Kumar opined that Mr. Castillo was limited to occasionally lifting and/or carrying no more than ten pounds and frequently lifting and/or carrying less than ten pounds; he was limited to at least two but less than about six hours of standing and/or walking in an eight-hour day and must periodically alternate sitting and standing to relieve pain or discomfort; and, he was limited in his ability to push and/or pull in his upper and lower extremities.[22] (AR 714-715.)

---

[22] These lifting, carrying, standing, walking, and sitting restrictions most closely align with sedentary work. *See* Social Security Ruling ("SSR") 83-10, 1983 WL 31251 at *5 (defining sedentary work as requiring "periods of standing or

In the narrative section of the exertional limitations category, the following was written: "I[g]A [n]ephropathy with [l]oin pain hematuria syndrome causes inflam[m]ation of the kidneys at all times." (AR 715.)

In the "postural limitations" category, Dr. Kumar opined that Mr. Castillo was limited to occasional climbing, balancing, kneeling, and stooping, and could never crouch or crawl. (AR 715.) As for "manipulative limitations," Dr. Kumar opined that Mr. Castillo was limited to occasional handling and fingering. (AR 716.) In the narrative sections of the postural and manipulative limitations categories, the following was written: "With my back being in pain 24/7 any physical activity causes discomfort and pain"; and, "[s]ince I have started all my medications my hands shake a lot. Also I get random strong muscle cramps." (AR 715-716.)

Next, Dr. Kumar opined that Mr. Castillo was "limited" in his speaking ability and in his ability to tolerate temperature extremes, noise, vibration, fumes, odors, chemicals, and gases. (AR 716-717.) In the narrative portions of these sections, the following was written:

> I have spent a good portion of my early teen years sick, in bed, and alone. I was never much good at talking to people but this def[]initely has stunted my communication growth"; and, "[e]xtreme colds cause a severe amount of pain. Noise/vibrations lasting for more than a minute cause noticeably more discomfort. Fumes/chemicals cause extreme headaches. Even something as simple as an air freshener bring[s] on migraines.

(AR 716-717.)

In her description of Dr. Kumar's opinions, the ALJ "note[d] that this statement contains two handwriting styles and that some of the handwritten sentences in the statement refer to [Mr. Castillo] in the first person." (AR 990.) At his 2014 hearing, Mr. Castillo testified that he filled in

---

walking…generally total no more than about 2 hours of an 8-hour workday"); 20 C.F.R. § 404.1567(a) ("Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools."). However, the agency's definition of sedentary work does not address the need to alternate periodically between sitting and standing. *See* SSR 83-10, 1983 WL 31251 at *5; 20 C.F.R. §§ 404.1567(a), 416.967(a).

the narrative portions of the form at home and the check box portions at an appointment with Dr. Kumar, in Dr. Kumar's presence and after talking it over with him. (AR 81-83.) Asked whether he thought the form expressed Dr. Kumar's opinions, Mr. Castillo confirmed that he did because he went over the form with Dr. Kumar, and Dr. Kumar read and signed it. (AR 82-83.)

### ii.    The ALJ's Reasons for Rejecting Dr. Kumar's Opinions

ALJs have a duty to consider all the medical opinions in the record and to explain the weight they assign to such opinions. *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1161 (10th Cir. 2012). The opinions of "treating sources" are generally entitled to more weight than those of other sources.[23] *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). "In deciding how much weight to give a treating source opinion, an ALJ must first determine whether the opinion qualifies for 'controlling weight.'" *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003). A treating source's opinion is entitled to "controlling weight" when it is both "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence" in the record. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). An ALJ's failure to expressly state whether she gave a treating source opinion controlling weight is not reversible error if she implicitly declined to do so in her decision.  *Mays v. Colvin*, 739 F.3d 569, 575 (10th Cir. 2014).

---

[23] Because Mr. Castillo filed his claim in 2012, (AR 89-90), the regulations regarding "treating sources" apply. 20 C.F.R. §§ 404.1527, 416.927 ("For claims filed…before March 27, 2017, the rules in this section apply.")  However, the Court notes that in Revisions to Rules Regarding the Evaluation of Medical Evidence published on January 18, 2017, the Agency revised its medical evidence rules. *See* 82 Fed. Reg. 5844-01 (Jan. 18, 2017). For claims filed on or after March 27, 2017, the new SSA regulations make several changes, including eliminating the distinction between treating and other sources.  *Reese v. Saul*, Civ. No. 19-0139 KBM, 2020 WL 2542008, at *5 n.3 (D.N.M. May 19, 2020).

However, even if a treating physician's medical opinion is not entitled to controlling weight, it is "still entitled to deference" and the ALJ must decide what weight, if any, to give it. *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007*); Robinson v. Barnhart*, 366 F.3d 1078, 1082 (10th Cir. 2004). In doing so, the ALJ should consider:  "(1) Length of the treatment relationship and the frequency of examination…; (2) Nature and extent of the treatment relationship…; (3) Supportability…; (4) Consistency…; (5) Specialization…; and (6) Other factors." 20 C.F.R. §§ 404.1527(c)(2)(i)(ii), (c)(3)-(c)(6), 416.927(c)(2)(i)(ii), (c)(3)-(c)(6); *see also Watkins*, 350 F.3d at 1300-1301. An ALJ need not explicitly discuss every factor, but she must "provide[] good reasons in [her] decision for the weight [she] gave to the treating source['s] opinions," *Oldham*, 509 F.3d at 1258, which "are sufficiently specific to [be] clear to any subsequent reviewers," *Langley*, 373 F.3d at 1119 (quoting *Watkins*, 350 F.3d at 1301) (quotation marks omitted), and supported by substantial evidence. *Doyal v. Barnhart*, 331 F.3d 758, 764 (10th Cir. 2003). "If the ALJ rejects the opinion completely, [she] must…give specific, legitimate reasons for doing so." *Id.* (brackets omitted).  Further, an ALJ may reject a treating physician's opinion outright "only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." *Id.* at 1121 (quoting *McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir. 2002)) (emphasis omitted).

Here, there is no dispute that Dr. Kumar was Mr. Castillo's treating nephrologist.  (Doc. 24 at 21; Doc. 28 at 8); *see* 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). Nevertheless, the ALJ rejected Dr. Kumar's opinions for three reasons.[24] (AR 994.) First, she appears to have concluded that his opinions were not really his, stating:

---

[24] The Court finds that the ALJ "effectively reject[ed]" Dr. Kumar's opinions by assigning them "little weight."  *See Chapo v. Astrue*, 682 F.3d 1285, 1290-91 (10th Cir. 2012) (discussing "the ALJ's justification for effectively rejecting (or, as the ALJ put it, 'according little weight to')" an examining source's opinion). The ALJ expressed no reliance

> [Mr. Castillo] testified that he actual[ly] completed the medical source statement, while Dr. Kumar just signed it…[Mr. Castillo] then backtracked in his testimony[25] saying that he and the doctor filled it out together, although as noted above, much of the statement is completed in the first person.

(AR 994.) Second, the ALJ found Dr. Kumar's opinions were "not consistent with or supported by objective medical records"; and finally, she found Dr. Kumar's opinions inconsistent with Mr. Castillo's "testimony that he attends college full[-]time, plays video games, hikes, lifts weights and cares for animals."  (AR 994.)

As an initial matter, the ALJ failed to abide by the treating physician rule of first assessing whether Dr. Kumar's opinions were entitled to controlling weight. *Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011). However, her statement that she gave little weight to the opinions plainly, albeit implicitly, denotes that she declined to give them controlling weight. Thus, her failure to expressly address this issue is not reversible error. *Mays*, 739 F.3d at 575.

Turning to the adequacy of the ALJ's stated reasons for rejecting Dr. Kumar's opinions, the ALJ first relied on Mr. Castillo's testimony that he, and not Dr. Kumar, physically filled out the form documenting Dr. Kumar's opinions. As Mr. Castillo points out, the ALJ did not explain why this caused her to reject the opinions. (Doc. 24 at 22-23.) Mr. Castillo also notes the ALJ never disputed the authenticity of Dr. Kumar's signature. (*Id.* at 22.) According to Mr. Castillo, that he filled out the form is inconsequential because Dr. Kumar adopted the opinions expressed in it by reading and signing it. (*Id.*)

---

on any part of Dr. Kumar's opinions in assessing Mr. Castillo's RFC; and, the limitations in the ALJ's RFC are significantly less restrictive than those in Dr. Kumar's opinion. (AR 987-994.)

[25] Substantial evidence does not support the ALJ's conclusion that Mr. Castillo "backtracked in his testimony." (AR 994.) At his 2014 hearing, Mr. Castillo consistently testified that he filled out the narrative portions of the form at home and the check box portions in Dr. Kumar's presence after talking them over with him, and that Dr. Kumar then read and signed the form.  (AR 81-83.)

Mr. Castillo is correct that the ALJ did not explain why the fact that he filled out the form Dr. Kumar signed caused her to assign Dr. Kumar's opinions little weight. Moreover, to the extent that the ALJ "rejected [Mr. Castillo's] undisputed testimony . . . that [Dr. Kumar] reviewed and agreed with the assessment," she erred in doing so. *See McGoffin*, 288 F.3d at 1252 (ALJ's "unfounded doubt" that treating physician agreed with assessment he signed was error). "At the least, if the ALJ believed that the matter was open to question, [she] had an obligation under the applicable regulations to obtain additional information from [Dr. Kumar] before rejecting the report outright." *Id.*; *see also Angster v. Astrue*, 703 F. Supp. 2d 1219, 1229 (D. Colo. 2010) ("Here, there was no reason for the ALJ to believe that [the plaintiff's treating psychiatrist] did not agree with the questionnaire when he signed it. Thus, he was in error for rejecting the assessment on this basis.").

In this regard, the Commissioner asserts the "ALJ could reasonably discount Dr. Kumar's opinion[s] because [they were] based on [Mr. Castillo's] own reports rather than supported by objective medical evidence." (Doc. 28 at 8 (citing 20 C.F.R. § 404.1527(c)(3); *Rivera v. Colvin*, 629 F. App'x 842, 845 (10th Cir. 2015)).) However, the ALJ did not proffer this explanation in her decision. *See Haga v. Astrue*, 482 F.3d 1205, 1208-09 (10th Cir. 2007) (declining to affirm ALJ's decision based on reasons Commissioner supplied for first time on appeal because the court "may not create or adopt post-hoc rationalizations to support the ALJ's decision that are not apparent from the ALJ's decision itself").

In addition, while an ALJ may reject a medical source opinion because it relies only on a claimant's subjective reports, *Flaherty*, 515 F.3d at 1070, she may not do so on the basis of *speculative conclusions* that the opinion relies only on such reports. *Langley*, 373 F.3d at 1121 (ALJ improperly rejected treating source opinion "based upon his own speculative conclusion that

the report was based only on claimant's subjective complaints"). Here, assuming the ALJ did conclude that Dr. Kumar's opinions were "based only on [Mr. Castillo's] subjective complaints," *id.*, that conclusion is speculative, resting entirely on how the form documenting those opinions was completed. Absent other evidence supporting the Commissioner's contention that Dr. Kumar based his opinions only on Mr. Castillo's subjective complaints, the Court cannot accept this rationale as a good reason to reject the opinions.[26]

As her second reason for rejecting Dr. Kumar's opinions, the ALJ wrote that Dr. Kumar's limitations were "not consistent with or supported by objective medical records." (AR 994.) However, she provided no specific references or citations to support this bald statement. (AR 994.) The Commissioner argues that the ALJ's discussion of Mr. Castillo's medical records in the "earlier pages of her decision" support this finding. (Doc. 28 at 9.) Specifically, the Commissioner points to the ALJ's discussion of reports that Mr. Castillo was doing well[27] (citing AR 516-518, 523-528, 604-606, 719-721); Mr. Castillo's preference not to treat with a traditional pain management provider, his reports of using narcotic pain medication sparingly, and his failure to pick up prescribed pain medication (citing AR 510, 516, 760-764); and, the ALJ's discussion of various imaging and diagnostic tests showing "unremarkable" or no worsening findings (citing AR 481-483, 722, 1267, 1282, 1288). (*Id.*) According to the Commissioner, this evidence "was

---

[26] Certainly, the ALJ could have concluded that Dr. Kumar based his opinions *in part* on Mr. Castillo's subjective complaints, given that the limitations to which he opined were largely attributed to Mr. Castillo's pain. (*See generally* AR 714-717.) However, Dr. Kumar also had at his disposal objective, clinical evidence to support Mr. Castillo's reported pain, including kidney biopsies showing IgA nephropathy and examination findings of flank tenderness. (AR 679-680, 892-893.)

[27] For example, in November 2011, Dr. Miller reported that Mr. Castillo was doing "well," (AR 526), while in January 2012, July 2012, February 2013, and May 2013, he reported that Mr. Castillo was doing "relatively well." (AR 516, 523, 604, 719). However, on all of these occasions, Dr. Miller also documented several permanent, chronic, or ongoing clinical and diagnostic abnormalities and health issues, including IgA nephropathy with focal proliferative glomerulonephritis, loin pain hematuria syndrome, the "concerning" presence of crescents on Mr. Castillo's 2011 kidney biopsy, hematuria, and persistent flank, abdominal, kidney, and/or back pain. (AR 517-518, 523-525, 526-527, 604-606, 719-721.)

inconsistent with the restrictive physical limitations described in Dr. Kumar's opinions, and [the ALJ] was not required to reiterate [it] in discounting" them. (*Id.* (citing *Raymond v. Astrue*, 621 F.3d 1269, 1272 (10th Cir. 2009); *Endriss v. Astrue*, 506 F. App'x 772, 777 (10th Cir. 2012)[28].).)

Mr. Castillo counters that, though the ALJ was required to provide "contradictory medical evidence" to support her rejection of Dr. Kumar's opinions, (Doc. 24 at 21 (quoting *McGoffin*, 288 F.3d at 1252)), she failed to do so beyond her vague, conclusory reference to "objective medical records." (*Id.* (quoting AR 994).) He further contends the ALJ's failure to cite to specific medical evidence was particularly problematic "in light of all the [medical] evidence that supports Dr. Kumar's opinions," including Mr. Castillo's longstanding diagnosis with chronic kidney disease, his extensive history of medical treatment related to severe back, abdominal, and flank pain, Dr. Miller's statement indicating the difficulty of treating his conditions, and Mr. Castillo's well-documented history of depression and anxiety secondary to pain. (Doc. 29 at 2-3 n.3-6.)

The Court finds that the ALJ's reference to "objective medical evidence" is insufficiently specific, such that the Court cannot meaningfully review this rationale to determine whether it is supported by substantial evidence. *Langley*, 373 F.3d at 1123 ("Because the ALJ failed to explain or identify what the claimed inconsistencies were between [the treating source] opinion and the other substantial evidence in the record, his reasons for rejecting that opinion are not 'sufficiently specific' to enable this court to meaningfully review his findings.") (citing *Watkins*, 350 F.3d at 1300). While the ALJ did refer to medical evidence earlier in her decision that could, in isolation, be construed to conflict with Dr. Kumar's opinions, she also referred to ample medical evidence

---

[28] *Endriss* does not assist the Commissioner. In that decision, the court held that the ALJ was not required to reiterate the objective medical evidence on which he relied to reject one treating source's opinion when he had already summarized that evidence in rejecting another treating source's "virtually identical" opinion. *Endriss*, 506 F. App'x at 776–777. Here, in contrast, the ALJ never summarized objective medical evidence on which she relied to reject opinions virtually identical to Dr. Kumar's. (AR 983-994.)

that supports these opinions. For example, she noted Mr. Castillo's ongoing diagnoses—supported by objective clinical findings—with IgA nephropathy and loin pain hematuria syndrome; that he "repeatedly" sought care for low back pain as well as for flank and abdominal pain, including in emergency room settings; that he used narcotic medications and marijuana for pain management, in the past found Neurontin effective, and attended physical therapy for his pain; that his diagnostic test showed "[i]ncreased renal cortical echogenicity consistent with chronic renal disease"; and, that he reported worsening flank pain with cold weather. (AR 988-990.) In addition, the record is replete with medical record evidence the ALJ did not discuss that supports Dr. Kumar's opinions.

On such a record, and in the absence of any citation to specific evidence, the Court can only guess at what "objective medical records" the ALJ found failed to support or conflicted with Dr. Kumar's opinions. As such, the Court cannot meaningfully consider whether substantial evidence supports the ALJ's reliance on such records to justify her rejection of Dr. Kumar's opinions, and cannot accept this explanation as adequate to support the rejection. *See Langley*, 373 F.3d at 1123.

As her third and final explanation for rejecting Dr. Kumar's opinions, the ALJ found Dr. Kumar's opinions inconsistent with Mr. Castillo's "own testimony that he attends college full[-] time, plays video games, hikes, lifts weights and cares for animals."[29] (AR 994.) The Commissioner contends this explanation is reasonable, and further maintains that "the ALJ was responsible for resolving conflicting evidence and reasonably did so here." (Doc. 28 at 9-10.) Mr. Castillo responds that the ALJ's description of his activities was inaccurate, incomplete, misleading, and/or compatible with Dr. Kumar's restrictions. (*See, e.g.*, Doc. 24 at 21 ("Plaintiff

---

[29] The Commissioner also argues that, in rejecting Dr. Kumar's opinions, the ALJ considered Mr. Castillo's ability to do homework and laundry, prepare meals, and read. (Doc. 28 at 9-10.) While the ALJ did outline these activities in an earlier portion of her decision, she did not mention them in relation to Dr. Kumar's opinions. (*Compare* 987-988 *with* AR 994.) As such, the Court cannot consider them to be reasons for rejecting those opinions.

testified that he goes to school *part time*, *not full time*, as indicated by the ALJ.") (emphasis added) (citing AR 1009); *id.* at 21-22 ("Plaintiff testified that he goes for walks and hikes…but cannot do much more than sit the next day.") (citing AR 1016); Doc. 29 at 5 ("[T]he ALJ's inference that Plaintiff's 'weightlifting' is inconsistent with Dr. Kumar's opinion is not supported by the record."); Doc. 24 at 22 ("The ALJ's inference that Plaintiff's playing of video games is exertionally taxing and mentally straining…is pure speculation.").)

Mr. Castillo's various points are well taken. First, as noted by Mr. Castillo, the ALJ incorrectly found that, according to Mr. Castillo's own testimony, he attends school full-time. (AR 994.) In fact, in June 2018, he testified that he attends school half-time and has "missed multiple days" due to his medical conditions.[30] (AR 1009-1010.) And, while Mr. Castillo did testify that he walked or hiked with his wife, he also testified that "the next day, and that night, [he was] not going to be able to do much other than sit."[31] (AR 1015-1016.) Likewise, Mr. Castillo did testify that he cared for his dogs and chickens. (AR 1018-1020.) However, he explained that the business from which he purchased chicken and dog food loaded his purchases for him and, once home, he left the food in his car and removed small amounts at a time. (AR 1019.) He added that he cleaned up after his dogs "if they make a mess in the house" but not in the yard, and described no other pet

---

[30] Similarly, in July 2014, Mr. Castillo testified that he was taking four classes for his first semester at the Central New Mexico Community College ("CNM"), but that he routinely attended only half of each class or left class early due to his pain. (AR 61-62, 78, 80-81.) He also testified that he had reduced his course load to three classes for his next semester. (AR 73.) In November 2014, Megan Williams, L.P.A.T., wrote that Mr. Castillo "attributed anxiety & depression to *being a full[-]time student*, dealing with chronic kidney disease, & being isolated from his family." (AR 833-837 (emphasis added).) However, this isolated reference does not address Mr. Castillo's testimony that he routinely left class very early and had reduced his course load due to his medical conditions. (*Id.*; AR 994.) The Commissioner concedes that, by 2018, Mr. Castillo was attending school half-time. (Doc. 28 at 2.)

[31] Also, he described his hikes as "short" to consultative examiner Mary Loescher, Ph.D., and stated in an Adult Function Report that he could only walk a quarter mile before needing to stop and rest for 15-20 minutes. (AR 353, 559-561.)

care activities.[32] (AR 1019-1020.)  Mr. Castillo also testified that he played video games before he was married; however, he did not state how often, for how long, or what type of games, and the ALJ did not explore these topics. (AR 1006-1013, 1015-1016.)

Finally, the ALJ incorrectly stated that Mr. Castillo testified he lifts weights. (AR 994.)  In fact, at neither of his hearings did he testify about lifting weights; and notably, at neither hearing did the ALJ ask him about it. (AR 55-88, 1006-1027.) The Court acknowledges that two of Mr. Castillo's mental health records do refer to weightlifting.  First, in a September 2013 treatment note, Brian Blocker, L.P.C.C., wrote that Mr. Castillo "likes to lift [weights] but can't due to [five-pound weight] restriction."  (AR 696-697.)  And second, in a November 2014 behavioral health assessment note, Megan Williams, L.P.A.T., wrote about Mr. Castillo:  "[s]edentary activity level. Never a health club member.  Exercise includes walking and lift[ing] weights.  Exercises 2-3 times a week."  (AR 834-837.) Notably, these records do *not* indicate how much weight Mr. Castillo lifted, how often, or for how long.[33]  Nor did the ALJ explore these omissions at either of Mr. Castillo's hearings or discuss them in her decision.  (AR 55-88, 981-996, 1006-1027.)

In light of the foregoing, the Court finds that the ALJ's third reason for assigning Dr. Kumar's opinions little weight is inadequate. *Langley*, 373 F.3d at 1121; *Doyal*, 331 F.3d at 764. Initially, the ALJ fails to cite to any medical evidence at all, let alone contradictory medical evidence, to substantiate this reason, and thus it fails to satisfy the Tenth Circuit requirement of contradictory medical evidence for rejecting a treating source's opinion. *Langley*, 373 F.3d at 1121 ("[A]n ALJ … may reject a treating physician's opinion outright only on the basis of contradictory

---

[32] Mr. Castillo's 2014 hearing testimony is generally consistent with his 2018 testimony. With respect to pet care, at the 2014 hearing he testified that he picked up his dog's "leadings" and took his dog to the park very occasionally, but otherwise denied any pet care activities. (AR 78-81.)

[33] Though Ms. Williams wrote that Mr. Castillo "exercise[d] 2-3 times a week," she did not indicate what portion of this exercise consisted of lifting weights, as opposed to "walking" or some other activity.  (AR 834.)

medical evidence and not due to his or her own credibility judgments, speculation or lay opinion.") (quoting *McGoffin*, 288 F.3d at 1252) (internal quotations marks omitted).

Further, attending college classes half-time with multiple absences, providing minimal animal care, playing video games, going on short hikes, and lifting unknown amounts of weight for unknown periods of time, with unknown frequency, and, in the case of hiking, with debilitating same-day and next-day effects, do not in themselves preclude the work-related limitations Dr. Kumar attributed to Mr. Castillo. *See, e.g., Williams v. Bowen*, 844 F.2d 748, 759 (10th Cir. 1988) ("limited activities in themselves do not establish that one can engage in light or sedentary work"); *Talbot v. Heckler,* 814 F.2d 1456, 1462-1463 (10th Cir. 1987) (short-term work projects and intermittent driving were not equivalent to gainful activity); *Broadbent v. Harris,* 698 F.2d 407, 413 (10th Cir. 1983) (yard work, household tasks, car repairs, and occasional car trips are not considered reasonably regular or prolonged activity); *Anaya v. Berryhill*, Civ. No. 17-00826-LF, 2019 WL 1324957, at *7 (D.N.M. Mar. 25, 2019) ("[a]bsent a function-by-function analysis," regular church attendance, caring for daughter and pets, and yard work did not support ALJ's conclusion that claimant was able to do light work); *Parraz v. Berryhill*, Civ. No. 17-143 KK, 2018 WL 2357275, at *10 (D.N.M. May 24, 2018) ("ALJ's reliance on sporadic and intermittent performance of daily activities to establish that a claimant is capable of engaging in substantial gainful activity is insufficient when a claimant's medical complaints are supported by substantial evidence."). Nor did the ALJ explain what about Mr. Castillo's participation in these activities was inconsistent with the work-related limitations to which Dr. Kumar opined. The ALJ's third reason for rejecting Dr. Kumar's opinions regarding Mr. Castillo's work-related limitations was therefore inadequate. *See Langley*, 373 F.3d at 1123 (ALJ's reasons for rejecting treating physician's

opinion were inadequate where ALJ failed to explain or identify claimed inconsistencies between treating physician's opinion and other substantial evidence in the record).

In summary, the Court finds the ALJ failed to provide adequate reasons for rejecting Dr. Kumar's opinions, and failed to cite to contrary medical evidence in support of her rejection of these opinions with sufficient specificity to satisfy Tenth Circuit standards. *Langley*, 373 F.3d at 1121. Further, because Dr. Kumar's opinions are significantly more restrictive than the ALJ's assessment of Mr. Castillo's RFC, the Court cannot say the ALJ's failure to adequately explain and support her rejection of Dr. Kumar's opinions was harmless.  *Cf. Mays*, 739 F.3d at 578-579 (ALJ's failure to provide adequate reasons for weight assigned to medical opinion is harmless "if there is no inconsistency between the opinion and the ALJ's assessment of [the claimant's RFC]."). The Court therefore grants Mr. Castillo's request for remand.

**B.  The Court Does Not Reach Mr. Castillo's Other Arguments**

Because the Court concludes that remand is required as set forth above, the Court will not address Mr. Castillo's remaining claims of error. *See Watkins*, 350 F.3d at 1299 (explaining that the reviewing court does not reach issues that may be affected on remand).

## V.  <u>Conclusion</u>

For the reasons stated above, Mr. Castillo's Motion to Reverse and/or Remand (Doc. 24) is GRANTED.

KIRTAN KHALSA
UNITED STATES MAGISTRATE JUDGE
Presiding by Consent